IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

WANDA TAYLOR,                           *

        Plaintiff,                      *

vs.                                     *        CASE NO. 4:07-CV-187 (CDL)

CHRIS DEMARCO and JEFF WATSON,          *

        Defendants.                     *

_____

O R D E R

        This action arises from the arrest of Plaintiff for theft by deception.  Plaintiff contends that the investigating law enforcement officer, Georgia Bureau of Investigation Agent Chris DeMarco, had no probable cause to believe she had committed a crime when he swore out an arrest warrant against her.  Plaintiff also contends that the local sheriff, Jeff Watson, unlawfully interfered with her right to bail after she was arrested and detained.

        Plaintiff sues DeMarco and Watson in their individual capacities pursuant to 42 U.S.C. § 1983 for violating her federal constitutional right to be free from unreasonable seizures and her right to bail, respectively.  She also asserts state law claims against Defendants arising from her alleged false arrest and malicious prosecution.  The Court presently has pending before it Plaintiff's motions for partial summary judgment as to the liability of DeMarco and Watson (Docs. 27 & 32), Defendants' motions for summary judgment as to Plaintiff's claims (Docs. 42 & 46), and Plaintiff's motion to strike the testimony of DeMarco's expert (Doc. 36).  For the reasons that

follow, the Court finds that Defendants are entitled to qualified immunity on Plaintiff's federal law claims, and thus their motions for summary judgment are granted as to those claims and Plaintiff's motions are denied.    The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims which are dismissed without prejudice.    The Court did not rely upon any evidence contained in the challenged affidavit in reaching its decisions, so Plaintiff's motion to strike is denied as moot.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment has the burden to show that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the summary judgment movant meets its burden, the burden shifts and the nonmoving party must produce evidence to show that there *is* a genuine issue of material fact.  *Id.* at 324.   The nonmoving party must "go beyond the pleadings," *id.,* and point the Court to "specific facts showing a genuine issue for trial,"  Fed. R. Civ. P. 56(e)(2); *accord Celotex Corp.*, 477 U.S. at 324.

The movant is entitled to summary judgment if, after construing the evidence in the light most favorable to the nonmoving party and

drawing all justifiable inferences in favor of the nonmoving party, no genuine issues of material fact remain to be tried. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party—there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

DISCUSSION

## I.   General Principles Applicable to Plaintiff's § 1983 Claims

Plaintiff brings claims against Defendants in their individual capacities pursuant to 42 U.S.C. § 1983.[1] DeMarco and Watson both contend that they are entitled to qualified immunity as to these claims. Qualified immunity shields public officers acting within the scope of their discretionary authority from liability so long as

---

[1] Plaintiff brings no official capacity claims against Defendants under federal law. Those claims would fail. Any official capacity claims against DeMarco would be construed as claims against the Georgia Bureau of Investigation, an arm of the State of Georgia, and thus barred by sovereign immunity. *See, e.g., Alden v. Maine*, 527 U.S. 706, 756 (1999). Any official capacity claims against Watson would be construed as claims against the Taylor County Sheriff and thus barred by sovereign immunity. *See, e.g., Manders v. Lee*, 338 F.3d 1304, 1328 (11th Cir. 2003) (en banc).

their acts do not violate clearly established law.  *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009); *accord Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation . . . protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted).

Where, as here, an official acted within the scope of his discretionary authority when he took the challenged action, the plaintiff must show that the official's conduct violated clearly established law.[2]  *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009).  In determining whether the official violated clearly established law, there are two key questions: (1) do the facts alleged show that the official's conduct violated a constitutional right? and (2) was the right clearly established at the time of the official's action?  *Id.* at 1326.

Plaintiff contends that DeMarco violated her constitutional right to be free from unreasonable seizure when he had a warrant

---

[2]"A government employee has acted within his . . . discretionary authority if objective circumstances show that the challenged actions occurred in the performance of the employee's duties and within the scope of this authority." *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) (per curiam) (internal quotation marks omitted). Plaintiff cannot seriously dispute that DeMarco was within the scope of his discretionary authority when he sought the arrest warrant for Plaintiff or that Watson was within the scope of his discretionary authority when he took the actions Plaintiff challenges here.

issued for her arrest without probable cause.  She maintains that Watson violated her due process rights when he interfered with her right to bail.  Since these claims arise from separate factual circumstances, the Court will analyze them separately.

## II.  Section 1983 Claims Against DeMarco

### A.   Factual Background[3]

In 2005, Melba McConnell, Plaintiff's ninety-four year-old aunt, told the Taylor County sheriff that Plaintiff had taken her property without authorization.  The sheriff contacted the Georgia Bureau of Investigation ("GBI"), and GBI Agent Leigh Brooks conducted an initial investigation.  Brooks interviewed Mrs. McConnell, who stated that Plaintiff was her niece; that Plaintiff requested access to her bank accounts; that she discovered that Plaintiff had taken approximately $41,000 from her accounts, mostly from certificates of deposit ("CDs"); and that Plaintiff did not use the money to pay Mrs. McConnell's bills or otherwise take care of her.[4]  (DeMarco Decl. ¶ 5, May 11, 2009.)  Brooks also interviewed Mrs. McConnell's nephew, David Gaultney, who told Brooks that Plaintiff received monthly pay for taking care of Mrs. McConnell and that Plaintiff was allowed to

---

[3]For purposes of this analysis, the Court views the evidence in the light most favorable to Plaintiff.

[4]Plaintiff disputes the facts as relayed by Mrs. McConnell, but she points to no evidence that Mrs. McConnell did not actually make these statements to Brooks.  Plaintiff contends that these statements are inadmissible hearsay, but the Court does not consider them for the truth of the matter asserted.  Rather, what Mrs. McConnell told the GBI is evidence of what DeMarco knew when he decided to pursue Plaintiff's arrest warrant.

access Mrs. McConnell's bank accounts so that Plaintiff could pay Mrs. McConnell's bills.  (*Id.* ¶ 6.)

After Brooks conducted the initial investigation, DeMarco, a GBI special agent, was assigned to the case.  He reviewed Brooks's investigation.  He also subpoenaed and reviewed records from Mrs. McConnell's bank and interviewed bank employees.  DeMarco conducted a second interview of Mrs. McConnell on November 10, 2005.  Mrs. McConnell's stepson, Carl McConnell Jr., was present at the interview and also provided information.  Based on the interviews and the documents, DeMarco learned the following:

In the late 1990s, Plaintiff moved to Reynolds and began providing care-giving assistance—such as cooking, cleaning, running errands, and driving—to Mrs. McConnell and her sister, Mary McInvale. Plaintiff received $1,000 per month for these services.  When Mrs. McInvale died in April of 2001, Mrs. McConnell, who was eighty-nine at the time and had mobility problems requiring a walker or a wheelchair, began to consider how her care could best be managed.

Mrs. McConnell decided to add Plaintiff's name to three of her CDs and other assets so that Plaintiff could continue taking care of her and pay her bills.[5]  (Attach. 1 to DeMarco Decl., GBI Interview of Mrs. McConnell, Nov. 10, 2005 3:05 [hereinafter McConnell Interview].)  Mrs. McConnell told DeMarco that Plaintiff was only

---

[5]It appears that Mrs. McConnell also continued paying Plaintiff $1,000 per month.

6

given access to her accounts to take care of her during her life and not for personal use.[6] (DeMarco Decl. ¶ 10; *see also, e.g.,* McConnell Interview 3:05.)

The main CD in question is CD No. 12269. A factual dispute exists as to when Plaintiff's name was added to the CD. Plaintiff contends that her name was added in 1998. DeMarco concluded that her name was not added until April 2001, just after Mrs. McInvale died. A genuine issue of fact exists as to the date that Plaintiff was added to the CD, but the Court finds that this fact is not material as to whether DeMarco is entitled to qualified immunity given the uncontradicted evidence that Mrs. McConnell told DeMarco that the accounts were to be used only for her benefit during her lifetime.

Following Mrs. McInvale's death in April of 2001, Plaintiff continued to care for Mrs. McConnell on a regular basis. As time passed, Mrs. McConnell believed that Plaintiff's care-giving services began to diminish.[7] According to Mrs. McConnell, Plaintiff would leave her alone for extended periods of time. (McConnell Interview 2:57 & 2:59 (stating that Plaintiff was "real good until she began to get things in her name, then I could tell she wasn't so good" and that Plaintiff would leave town for weeks at a time).) In September

---

[6]Again, Plaintiff disputes the facts as relayed by Mrs. McConnell, but she points to no evidence that Mrs. McConnell did not actually make these statements to DeMarco.

[7]Plaintiff appears to contend that her care-giving services did not diminish, but she points to no record evidence to dispute that Mrs. McConnell told DeMarco that Plaintiff's care-giving services diminished.

of 2002, Plaintiff redeemed CD No. 12269, which was valued at $36,876.43.  With the proceeds, Plaintiff obtained a cashier's check payable to herself in the amount of $6,876.43, which she used to pay her personal expenses.   With the remaining proceeds, Plaintiff purchased a CD in her own name with a face value of $30,000.[8]

In October of 2002, Mrs. McConnell discovered that CD Nos. 12269 and 13482 were missing from her safety deposit box.  (Hill Aff. ¶ 11, May 1, 2009.) She learned that Plaintiff had redeemed CD No. 12269. She also learned that Plaintiff might have another CD, No. 13482, in her possession.  (*Id.*)  Mrs. McConnell asked for a duplicate of CD No. 13482 and immediately redeemed it, using the proceeds to buy a new CD in her name only.  (*Id.* ¶ 12.)   The bank sent Plaintiff a letter to notify her that CD No. 13482 had been cashed.  (*Id.* ¶ 13.) Shortly thereafter, Plaintiff moved to Athens, Georgia.[9]

After considering all the information he received, DeMarco presented the matter to a magistrate judge, who issued a warrant for

---

[8]Plaintiff denies that the redemption and her use of the funds was unauthorized, but she does not point to any evidence on this point: the only evidence regarding the purpose of the CDs is Mrs. McConnell's statement that the CDs were meant to be used to take care of Mrs. McConnell during her life, and Plaintiff pointed to no evidence that Mrs. McConnell authorized Plaintiff's personal use of the proceeds from CD No. 12269.  Regardless of whether Plaintiff was actually authorized to redeem the CD for her own benefit, Mrs. McConnell told DeMarco that Plaintiff's actions were unauthorized.

[9]It is not clear whether DeMarco learned all the specifics of Mrs. McConnell's October 2002 dealings with the bank, but it is undisputed that DeMarco knew that Mrs. McConnell discovered in October of 2002 that Plaintiff redeemed a CD for her personal use and that Mrs. McConnell took action to take Plaintiff's name off Mrs. McConnell's remaining assets. (McConnell Interview 3:05.)

Plaintiff's arrest for theft by deception in December of 2005. Pursuant to the warrant, Taylor County sheriff's deputies arrested Plaintiff on December 21, 2005.

Mrs. McConnell died on March 16, 2006.  In June of 2006, after Mrs. McConnell's death, an assistant district attorney notified DeMarco that the district attorney would not prosecute the case because he believed the matter should be handled in civil court. (Ex. 6 to DeMarco Dep., Jan. 9, 2009.)

B.   DeMarco's Motion for Summary Judgment

Plaintiff contends that DeMarco violated her right to be free from unreasonable seizures because DeMarco sought a warrant for her arrest without probable cause.  The reasonableness of an arrest "turns on the presence or absence of probable cause." *Case*, 555 F.3d at 1326.  The existence of probable cause at the time of arrest bars a § 1983 action for false arrest.  *Id.* at 1326-27.  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime."  *Id.* at 1327 (internal quotation marks omitted).  "This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances."  *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007).

9

"Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed." *Case*, 555 F.3d at 1327 (citing *Lee*, 284 F.3d at 1195). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Id.* (internal quotation marks omitted). "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists." *Skop*, 485 F.3d at 1137.

"Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime and the operative fact pattern." *Id.* at 1137-38 (internal citation omitted). Here, DeMarco applied for an arrest warrant based on theft by deception in violation of O.C.G.A. § 16-8-3.[10] If DeMarco had probable cause or arguable probable cause to arrest Plaintiff for this offense, he is entitled to qualified immunity. *See Skop*, 485 F.3d at 1138.

Under O.C.G.A. § 16-8-3, "[a] person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the

---

[10]DeMarco argues that he also had probable cause to arrest Plaintiff for exploitation of an elder person under O.C.G.A. § 30-5-8. Because the Court finds that DeMarco had arguable probable cause to seek an arrest for theft by deception, the Court need not address whether DeMarco's alternative argument has merit.

property."  It is undisputed that Plaintiff obtained property from Mrs. McConnell when she redeemed the CD for her own personal use. The question is whether DeMarco reasonably believed that Plaintiff did so by deceitful means with the intention of depriving Mrs. McConnell of the property as contemplated in the statute.

> A person deceives if he intentionally . . . [c]reates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false . . . [f]ails to correct a false impression of an existing fact or past event which he has previously created or confirmed . . . [or] [p]romises performance of services which he does not intend to perform or knows will not be performed.

O.C.G.A. § 16-8-3(b).

"The gravamen of theft by deception lies in obtaining the property of another by intentionally creating a false impression as to an existing fact or past event." *Ellerbee v. State*, 256 Ga. App. 848, 851, 569 S.E.2d 902, 905 (2002). Based on the information DeMarco had at the time of his warrant affidavit, he could reasonably conclude that Plaintiff induced Mrs. McConnell to add Plaintiff's name to her assets by promising that the funds would only be used to take care of Mrs. McConnell during her lifetime.  Therefore, when Plaintiff made the promise to Mrs. McConnell, she created an impression about an existing fact—the character and use of the assets.  Thus, Plaintiff had an ongoing and continuous duty to use the funds solely for Mrs. McConnell's benefit.  Based on the information DeMarco had, it was reasonable for DeMarco to find that probable cause existed that Plaintiff used the assets for her own

benefit without authorization.  Furthermore, it was reasonable for him to conclude that Plaintiff misappropriated Mrs. McConnell's assets by deceit when she converted them to her personal use without informing Mrs. McConnell that she no longer intended to use them solely for Mrs. McConnell's benefit.  It was also reasonable for DeMarco to conclude that Plaintiff accomplished the misappropriation because of the special trust Mrs. McConnell had placed in her.  Under these facts, DeMarco had arguable probable cause to believe that Plaintiff committed theft by deception when she redeemed Mrs. McConnell's CD for her own benefit.[11]

Plaintiff maintains that DeMarco's investigation was constitutionally deficient primarily based upon his decision not to interview Plaintiff before seeking the arrest warrant.[12]  Police officers "are not required to perform error-free investigations or

---

[11]That DeMarco listed October 2002 as the offense date rather than September 2002—when Plaintiff actually redeemed the CD—is immaterial. Even if DeMarco was mistaken in his legal conclusion that the offense occurred when Mrs. McConnell discovered in October of 2002 that Plaintiff redeemed the CD and the offense actually occurred in September of 2002 when Plaintiff redeemed the CD, such a mistake is not fatal. *Cf. Denton v. United States*, 465 F.2d 1394, 1394 (5th Cir. 1972) (per curiam) (mistake in arrest warrant can be remedied in a subsequent indictment).

[12]Plaintiff contends that DeMarco did not do an investigation at all. However, the undisputed evidence reveals that DeMarco reviewed Agent Brooks's interviews of Mrs. McConnell and Mr. Gaultney, reviewed records he received from the bank, and interviewed Mrs. McConnell and her stepson. From this investigation, DeMarco reasonably concluded that (1) Plaintiff requested access to Mrs. McConnell's accounts, (2) access was granted in 2001 but only for the purpose of taking care of Mrs. McConnell, (3) Plaintiff redeemed a CD for her own use in September of 2002, and (4) Mrs. McConnell discovered the redemption in October of 2002 and took action to remove Plaintiff's name from her other assets.

independently investigate every proffered claim of innocence." *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 n.10 (11th Cir. 2004). Although an officer cannot ignore exculpatory information that has been offered to him or that is easily discoverable, he is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Id.* at 1229. Here, DeMarco based his probable cause determination on the information he received from Mrs. McConnell and two of her relatives, as well as corroborating bank records. The Court finds that it was reasonable for DeMarco to do so. *Cf. Kelly v. Curtis*, 21 F.3d 1544, 1551 (11th Cir. 1994) (noting that officer has no affirmative duty to seek out exculpatory information of which he is not aware). Furthermore, Plaintiff did not point the Court to any exculpatory evidence she could have provided to DeMarco had she been interviewed prior to the arrest, much less exculpatory evidence that would have diminished the probable cause DeMarco possessed. For these reasons, the Court concludes that DeMarco's decision not to interview Plaintiff prior to the arrest does not render his investigation constitutionally deficient.

For all of these reasons, DeMarco is entitled to qualified immunity as to Plaintiff's § 1983 claims against him. His motion for summary judgment is therefore granted as to the § 1983 claims, and Plaintiff's motion is denied.

13

**III. Section 1983 Claims Against Watson**

A.   Factual Background[13]

Watson is Sheriff of Taylor County. Watson had no direct involvement in Plaintiff's arrest or booking. After Plaintiff's arrest on December 21, 2005, a magistrate judge set bail in the amount of $41,000. (Watson Dep. 48:16-23, Jan. 9, 2009.) Plaintiff contends, however, that Watson was involved in deciding the bail amount, citing the statement of Donald Wilson, who was Plaintiff's fiancé at the time of the incident. Wilson states that he "understood" that Watson played some role in setting the bail amount because Watson told Wilson that the bail amount was $41,000 because Watson felt "that's what it ought to be." (Wilson Statement ¶¶ 6-7, Feb. 27, 2009.)

Neither Plaintiff nor her representatives offered a property bond for Plaintiff's release from detention. However, Wilson did attempt to get a bondsman to write a bond. On December 22, 2005, Wilson met with Reggie Carter of R&N Bonding Company ("R&N"), a surety approved by Watson. (*Id.* ¶ 9.) Carter told Wilson that he would need to provide 15% of the $41,000 to get a bond for Plaintiff. (*Id.*) Wilson obtained a cashier's check for the correct amount. (*Id.* ¶ 10.) Wilson then either returned to Carter and "discovered" a purported requirement for two bonding companies to write

_____

[13]Again, for purposes of this analysis, the Court views the evidence in the light most favorable to Plaintiff but notes that a great many of Plaintiff's contentions are not supported by the record.

Plaintiff's bond (*id.* ¶ 11), or he returned to his home in Gwinnett County, Georgia and learned from Plaintiff's sister of the purported two bonding company requirement (*id.* ¶ 12).[14]  In any event, Wilson returned to Taylor County on December 23 with two cashier's checks and secured a bond from R&N and Betty's Bonding.  Plaintiff was released from jail that evening.  Plaintiff brings due process claims against Watson, contending that his acts and omissions delayed Plaintiff's release from jail. (Compl. ¶¶ 23-42.)

Plaintiff's chief contention is that Watson did not accept a bond written solely by R&N and that such a refusal was unreasonable. There is some evidence that Watson had a general practice of using multiple bondsmen for bonds over $30,000. (Watson Dep. 24:1-10; *see also* Watson's Resp. to Pl.'s 2d Interrogs. No. 8, Nov. 6, 2008. *But see* Watson Dep. 22:5-10 (stating bondsmen in Taylor County will not write a high bond alone and that this is up to the individual bondsman).)  There is also evidence that Carter told Wilson that he needed to have two bonding companies write Plaintiff's bond. (Wilson Statement ¶¶ 11, 14.)  However, Plaintiff points to no evidence that *Watson* required multiple bondsmen *for Plaintiff's bond* or that Watson refused a bond written solely by R&N.  According to Watson, he did not refuse a bond from R&N (Watson Dep. 28:23-29:6), he did not tell R&N that it could not write the bond (*id.* at 29:18-21), and he did

---

[14]Watson did not tell Wilson about a requirement for two bondsmen to write the bond, and no such requirement is posted in the sheriff's office.

not tell his employees that he would not take a bond from only one bonding company in this case (*id.* at 29:14-17).  Watson took the bond once it was presented to him on December 23, 2005.

In an attempt to controvert Watson's testimony, Plaintiff points to Wilson's statement and argues that it shows that Watson refused a bond written solely by R&N.  It does not.  According to the statement, Wilson "discovered" either when he returned to R&N with the certified check or when he spoke with Plaintiff's sister that Watson "would not accept a bond solely from [R&N]."  (Wilson Statement ¶¶ 11-12.)  Plaintiff seeks to use these statements to contradict Watson's testimony and establish that Watson *did* tell R&N that it could not write Plaintiff's bond alone.  However, Wilson's statements about what Watson did are based not on Wilson's personal knowledge but on his assumptions, which are based on hearsay.  Thus, the statements are not admissible to defeat summary judgment.  *See* Fed. R. Civ. P. 56(e) (requiring that affidavit supporting or opposing summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated"); *see also Polite v. Dougherty County Sch. Sys.*, 314 F. App'x 180, 183 (11th Cir. 2008) (per curiam) (concluding that plaintiff had not met his summary judgment burden because the only evidence in support of his contention was an affidavit not based on personal knowledge).

16

Plaintiff points to no other evidence that Watson's acts or omissions delayed Plaintiff's release from jail.

B.   Watson's Motion for Summary Judgment

Watson argues that the evidence viewed in the light most favorable to Plaintiff establishes that Watson is entitled to qualified immunity on Plaintiff's § 1983 claims.   The Court agrees.

Plaintiff's first complaint is that her bond was too high in light of her clean record and low flight risk.   However, she points to no evidence to create a genuine issue of material fact that Watson violated a clearly established law with regard to the bail amount. The evidence establishes that a magistrate judge—not Watson—set Plaintiff's bail.   (Watson Dep. 48:16-23.)   *See* O.C.G.A. § 17-6-1 (requiring bail to be set by judicial officer).   Furthermore, Plaintiff points to no evidence from which a reasonable juror could conclude that Watson actually influenced the magistrate judge's actions with regard to the bail; there is no evidence that Watson had any contact with the magistrate judge about the bail amount.[15]   In sum, Plaintiff has not pointed the Court to sufficient evidence to allow a jury to conclude that Watson's acts and omissions caused

---

[15]There is no evidence based on personal knowledge that Watson actually set or participated in setting the bail amount.   Wilson's vague statement of his "understanding" that Watson set the bail amount does not change this conclusion; Wilson's statement does not show, based on personal knowledge, who set the bail amount or how the bail amount was set, and it does not contravene the clear evidence that a magistrate judge set the bail amount.

Plaintiff to have an excessive bail, and Watson is therefore entitled to qualified immunity on any excessive bail claims.

Plaintiff also contends that Watson violated clearly established law because he had a general practice of requiring multiple bondsmen for large bail amounts but did not post the policy. Plaintiff's theory of the case is that Watson told R&N—after Carter sent Wilson to get a single cashier's check—that R&N could not write Plaintiff's bond by itself and that Watson would require another bondsman to be involved. As a result, Plaintiff contends she spent an extra day in jail because Wilson did not know he needed to secure a bond from two bondsmen until after the banks closed on December 22. There is no evidence, however, to support Plaintiff's theory that there was any interaction between Watson and R&N.

Whether or not Watson had a general practice of requiring multiple bondsmen in certain cases, Plaintiff points the Court to no evidence that Watson required multiple bondsmen *in this case*. Rather, the uncontradicted evidence establishes that Watson did not refuse a bond from R&N, did not tell R&N that it could not write the bond, and did not tell his employees that he would not take a bond from only one bonding company in this case. As discussed above, Wilson's statement cannot create a genuine issue of material fact on these matters because Wilson has no personal knowledge of what Watson did or did not do with regard to Plaintiff's bond. With no other evidence to suggest that Watson refused a bond from R&N or told R&N

18

it could not write the bond alone, Plaintiff cannot create a genuine issue of material fact on this issue.  Therefore, she cannot establish that Watson interfered with Plaintiff's right to post bail, and Watson is therefore entitled to qualified immunity on this claim.

For all of these reasons, the Court grants Watson's motion for summary judgment as to Plaintiff's § 1983 claims against him and denies Plaintiff's motion.

CONCLUSION

For the reasons set forth above, Plaintiff's motions for partial summary judgment as to the liability of DeMarco and Watson (Docs. 27 & 32) are denied, and Defendants' motions for summary judgment as to Plaintiff's § 1983 claims (Docs. 42 & 46) are granted.  Plaintiff's motion to strike the testimony of DeMarco's expert (Doc. 36) is moot. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and those claims are dismissed without prejudice.  *See* 28 U.S.C. § 1367(c)(3).

IT IS SO ORDERED, this 24th day of August, 2009.


S/Clay D. Land
                CLAY D. LAND
            UNITED STATES DISTRICT JUDGE